WHITE *v.* PERRY.

Decided November 9, 1878

1878
Special Term.

1. The doctrine of *lis pendens*, applies only to a purchaser, pending the suit, of the subject matter of controversy in the suit; and therefore the recording of a *lis pendens* when a common law suit is brought to obtain judgment for a debt, will not bind the lands of a defendant, which are *bona fide* purchased pending such suit.

2. The wife, having no interest in the subject matter after the death of the husband, is competent to prove facts coming to her knowledge from other sources, and not by means of her situation as wife, though they relate to transactions of her husband; but she is incompetent to prove any declaration of his made to her, or in her presence, which might affect his character; even could such declaration be proven by her, even if they did not affect his character.

3. The law does not presume fraud; and it is not to be assumed on doubtful evidence, or circumstances of mere suspicion; but it must be distinctly proven. It need not however be proven by direct and positive proof; but like any other fact it may be proven by circumstantial evidence; and if the facts and circumstances of the case are such as to lead a reasonable man to the conclusion, that fraud in fact existed, and was known to the grantee, the conveyance affected thereby should be declared void *in toto* as to creditors of the grantor.

Appeal from, and *supersedeas* to, a decree of the circuit court of Greenbrier county rendered on the 1st day of November, 1877, in a cause in said court then pending in which George White was plaintiff, and Joseph Perry

and others were defendants, granted on petition of Lewis T. Tolley.

Hon. Homer A. Holt, judge of the eighth judicial circuit, rendered the decree appealed from.

GREEN, PRESIDENT, furnishes the following statement of the case:

In February, 1876, George White brought a chancery suit in the county court of Greenbrier county against Joseph Perry, Lewis Tolly, David Watts and Lowery & Holly. In his bill he alleges, he recovered against Perry on December 1, 1875, a judgment in said court for $1,885.75 with interest from that day and costs $21.76. Which judgment was regularly docketed on December 3, 1875; that when he commenced the suit, in which the judgment was rendered, on October 4, 1875, he had a *lis pendens* duly recorded, which stated, that the object of the suit was to obtain a judgment on a certain bond, and ultimately to obtain a lien on all of Perry's lands, specifying them; that nevertheless Tolly afterwards on October 20, 1875, bought, or pretended to buy, of Perry, and had conveyed to him by deed, a portion of Perry's land; that the other defendants Watts, and Lowery & Holly had obtained severally judgments against Perry; that Watts's judgment was barred by the statute of limitations, and the judgment of Lowery & Holly had been paid off; that Perry had no personal property, out of which plaintiff's judgment against him could be made, and the plaintiff had a right to charge his lands, including the land bought by Tolly, with the payment of his judgment. The bill prays, that all the lands of Perry may be so subjected, and especially all the land embraced in the *lis pendens* notice; and for general relief. Copies of the judgments named in the bill and of the *lis pendens*, which included the land afterwards bought by Tolly, and the deed to him were filed.

Lowery & Holly answered the bill, admitting that their debts were paid. Wm. P. Bucker and Mathews & Mathews filed petitions setting up judgments, which had been rendered in their favor severally in March, 1876, and January, 1876. The bill was taken for confessed as to all the other defendants; and on March 11, 1876, the county court without deciding, whether the lands deeded to Tolly could be charged by reason of the recording of this *lis pendens*, decreed, that Perry should pay to the plaintiff and to the petitioners severally their judgments in the order of their rendition; and if he failed to do so in thirty days, his lands, other than those deeded to Tolly, should be sold on certain terms by a commissioner; and the court further decided, that the debt due to defendants Lowery & Holly had been paid, and that due defendant Watts was barred by the statute of limitations.

The lands were accordingly sold by the commissioner; and after applying the net proceeds to the payment of plaintiff's judgment there remained still due thereon $899.11. At the September term, 1876, the court confirmed the sale, there being no exception to the report of the commissioner; and deciding that the lands, which had been bought by Tolly, were liable for the payment of this balance of $899.11 due the plaintiff, because of the *recordation* of the *lis pendens*, it is ordered, that unless this balance be paid in thirty days, a commissioner of the court should sell the land, which had been so conveyed to Tolly.

Afterward on November 24, 1876, Tolly asked leave to file a paper, which was a petition for a rehearing and answer, which leave the court granted, and on its being filed granted the rehearing, and sustainded the decree for the sale of the lands deeded to Tolly. This answer was replied to generally.

In this answer Tolly says, that he was absent at the time, and ignorant of the rendition of the decree to sell his lands. He alleges, that he bought this land for a full

and valuable consideration, and has paid since $1,000.00 in full for the same ; and further, that when the judgment was rendered in favor of White, it was expressly agreed with him, that he would not attempt to enforce it against his, Tolly's, land. He claims, that this *lii pendens* did not bind his lands—and asks, that the decree directing its sale may be reheard, and that this petition might be also regarded as his answer to the bill. At the April term, 1877, the cause was by consent removed to the circuit court of Greenbrier.

1878
Special Term.

White
v.
Perry.

An amended bill seems to have been filed, while the cause was pending in the county court ; but when it was filed, does not appear. This amended bill alleges, that when Tolly purchased, he had actual notice of the plaintiff's common law suit against Perry ; that this purchase was a mere sham intended to delay, hinder and defraud the plaintiff, and that no consideration was paid for said land, pretended to have been purchased by Tolly ; that Perry died and his estate had been committed to the sheriff of Greenbrier; and that if Perry was paid for the land, or a bond given therefor, Perry's administrator should account therefor ; and it makes this sheriff, as administrator of Perry, a defendant.

After the case was removed to the circuit court, Tolly filed his answer to this amended bill. He denies its allegations, and says, " that when he bought this land of Perry, he still had other lands unincumbered amply sufficient, at a price much less than its full value, to pay the debts of the plaintiff and all other debts, that he owed ; and that he bought this land in perfect good faith, and at its full value ; that he bought in October, 1875, at the price of of $1,000,00, to be paid within a very few days ; that he executed his bond for the purchase money, and in three days thereafter paid it off in full, and took it up ; and that the whole of said purchase money was paid by him in cash, and said bond taken up, cancelled and destroyed."

On June 23 the court referred the cause to a commis-

sioner, to settle the accounts of Perry's administrator and the debts of Perry and their priorities. The commissioner reported, that no personal assets had come into the hands of the administrator; that Perry's debts with interest amounted to $2,979,84, all judgments, taxes or liens on the lands, except $416.78; that the lands sold by Perry to Tolly were assessed at $1,069.66; and that the real estate, of which Perry died seized, was worth from $650.00 to $700.00.

This report was by the decree of the circuit court, rendered November 11, 1877, confirmed, it not being excepted to. And White having theretofore purchased all the lands of Perry, which had been sold by a commissioner of the court, he was ordered to pay certain creditors having liens prior to his $252.97, and the balance of the purchase money $981.66 was directed to be credited on the judgment due White. The court then rendered no decision on the questions at issue between White, the plaintiff, and the defendant Tolly.

A second amended bill was filed, making the widow and children of Joseph Perry parties defendant, and setting forth the character of plaintiff's debt, and that it was an old debt well known to Tolly, who was a near neighbor, and knew of Perry's utter insolvency for years prior to his death, he not having $200.00 worth of personal property, and his land being insufficient to satisfy even the plaintiff's debt; and it reiterates the charges that the pretended purchase made by Tolly of Perry was a fraud, and that no valuable consideration was paid for the land deeded to him.

Many depositions were taken to sustain these allegations by the plaintiff; and many by the defendant Tolly to sustain his answer.

They prove, that both before and after the making of the deed by Perry and wife to Tolly, Perry was a very poor man, having much difficulty to supply his family with necessaries, that the same or greater difficulty of this kind existed after this purchase, they living for a con-

siderable time on corn bread and coffee. He had of personal estate at his death about $75.00 worth. Tolly furnished the family with a small amount of provisions and a little money subsequently to his purchase, and told Perry, that if he wanted anything for himself or family, to send to him, and if he did not have it, he would get it for him. Tolly was a man of considerable means, and had generally money on hand, and was in good credit. He had full notice of the amount of the plaintiff's claim; and of the recording of the *lis pendens*, when he obtained the, deed from Perry. On one occasion, when an officer was about to serve on Perry summons for two small debts of $50.00 and $25.00, he protested against paying these debts; and his wife said, that they did not have $200.00 worth of personal property, and she would go before a justice and give in a list of their property; and Tolly, who was present, said, that if she had the money, that he had paid her, that was no body's business. She accordingly claimed the benefit of the exemption of their personal property, making oath, that he did not have over $200.00 worth of personal property including bonds and money, she then said he had no bonds and only fifty cents in money. This was shortly before his death. After his death she had a $100.00 note, she wanted changed. A large amount of testimony was taken, giving the declarations of Perry and his wife about this transaction, when Tolly was not present, or giving the declarations of Tolly in the absence of Perry.

This evidence was excepted to at the time. These declarations were not very consistent. Perry sometimes said, that the $1,000.00 had been paid her by Tolly; but several witnesses prove, that Perry and his wife on several occasions in Tolly's absence stated, that Tolly had paid the $1,000.00, and that it was handed over to Mrs. Perry for her benefit and that of her two children.

The direct evidence in relation to this transaction is that of the notary, who wrote the deed. He states the transaction according to his recollection thereof. "The

consideration expressed in the deed was $1,000.00. After the deed had been duly acknowledged by Perry and wife and handed over to Tolly, no money being paid, the notary suggested the propriety of Tolly executing to Perry his note for the $1,000.00. Tolly stated, that he had not the money with him, but that the amount was then in the hands of W. Stewart, a merchant, then at the White Sulphur Springs, and in the bank at Lewisburg, and would be paid over to Perry in a few days. The note was executed by Tolly to Perry for the $1,000.00 payable on demand. It was written by the notary, signed by Tolly and handed by the attorney to Perry, who handed it to his wife, who took charge of it."

Stewart proves, that Tolly then had no moneys of his in his hands, but says, that if Tolly had needed two or three hundred dollars, he could have borrowed it of him. He says, that Tolly had on several occasions told him, that he had bought and paid for this land. This statement was excepted to as improper evidence. It was also proved, that at that time Tolly had in the bank of Lewisburg $500.00, which was paid out on various checks to different parties, the first being given for $50.00 three weeks after the date of the deed, and the balance during the first six months of 1876 on checks varying from $30.00 to $262.85.

Mrs. Perry, whose deposition was excepted to on the ground of her incompetency, testifies, that a few days after the deed was made, Tolly came to Perry's house: and he told her that Tolly had settled with him and paid him; and she helped him up in the bed, and he told her to get Tolly's bond. She got the bond and gave it to Tolly. She did not see Tolly pay him the money; but he gave her money, how much she does not state. She states; that this money, he gave her, she spent in necessaries; that they had a large number of relatives with them from June 14th to August 21st, but she could name but one. A part of this money was spent in buying food after Perry's death; and she still had of

it not over $100.00, which she expected to spend for provisions. She says, when she swore before a justice, that her husband did not have $200.00 worth of personalty, she said nothing about money. The justice however says, she said her husband had but fifty cents. This deposition is excepted to as that of an incompetent witness.

Tolly in his deposition states the transaction thus : he says, Perry told him, he had sold this land to Vaugh for $1,300.00, but he proposed to give it up, and he Perry could have it for $1,000.00 cash. This proposition was afterwards accepted ; and he took Col. McPherson with him to Perry's house to have the deed executed. He had in his house at the time the $1,000.00, or very nearly that amount in cash, but did not think to take it along. He supposed, when he went, that Perry would execute to him the deed, and he would give him his bond. After the papers were fixed up, he, Tolly, told Perry he would pay him in a day or two. The notary replied, he had better execute a bond to Perry. The notary wrote it, and he, Tolly, signed it, and the notary handed it to Perry. He does not distinctly recollect, how he said he would pay the money, but thinks he said he did not know, whether he had all the money by him, or not, and if he did not have enough, he could get it from Stewart, or he had a little in bank, that he could get, if he stood in need of it, or something to that amount. He says, that Mathews had paid him $1,891.41 ; that on the 22d day of April, six months before the deed was made, he drew out of bank $899.41, and left a balance $1,000.00 in the bank ; this $899.41, with other moneys he had, he wanted to pay off this $1,000.00 due Perry. He says, he did not say, when the deed was executed, that he had the money in his house, because he did not often tell, what money he had in his pocket, or in his house. He did not give his deposition till after the decree to sell this land, because he did not deem it necessary till called upon. He states, that the plaintiff and

the notary, Col. McPherson, were present, when he pur⁻ chased the land and executed his note for it. Neither McPherson nor White however says anything about White being present, when this note was executed. Tolly in his deposition says, he paid off this bond in greenbacks, he had in his house then, or four days after it was executed, He paid it to Perry in bed at his house. He thinks no one was present at the time, unless it was Perry's wife. He produced the bond, which was not cancelled.

It was proved by one witness, that before Tolly got this deed, he told witness, that Perry was in a needy condition and had proposed to let him have this land and take pay, part in a little money, and in provisions along at times. This witness, who was White's attorney, informed him of the recording of the *lis pendens,* and told him, he thought it would not be safe for him to buy this land without some previous arrangement with White. And he thought, if Perry and his wife would unite in a deed of trust for White's benefit on all his other lands, he would re- linquish his claim on this land. Tolly said he would have nothing to do with it. But after his purchase it appears from Tolly's statement, and that of others, that he got a power of attorney from Perry to confess judg- ment to White ; and Tolly says, he understood if this was done, White would sign an agreement not to inter- fere with Tolly's purchase. But there was obviously some misunderstanding, as the agreement was never signed, and the judgment never confessed.

On November 17, 1877, the court being of opinion, that the defendant Tolly, under the circumstances and facts disclosed in the proofs in this cause, did not, by the conveyance made to him by Joseph Perry by deed dated October 18, 1875, become such a *bona fide* purchaser, as would protect said lands from being charged in his hands with the payment of the debts due to the plaintiff and others of equal or paramount dignity, decreed that un- less the debts ascertained by the commissioner's report,

which had been confirmed, were paid in ninety days, a

commissioner appointed by the court should sell said lands." This decree recites, that all parties conceded, that the rents and profits would not pay the debts in a reasonable time. From this decree an appeal and *supersedeas* was allowed on the petition of Lewis T. Tolly.

*Mathews & Mathews,* for appellants citedthe following authorities:

2 Tuck. Com. 428, 429, 448; 2 Kent Com. 101, n. 1; 1 Strob. Eq. 180; 6 B. Mon. 441; 5 Leigh 627; 7 Md. 537; 1 McCord (S. C.) Ch. 252; 2 Metc. (Ky.) 356; 4 Cow. (N. Y.) 667; Big. on Fraud 301; 3 Atk. 392; 28 Gratt, 49, 57; Kerr on Fraud and Mistakes, 382, 384; Va. L. J. for Jany. 1878, p. 17.

*A. C. Snyder,* for appellee, cited the following authorities:

10 W. Va. 88, 107; *Id.* 321; 17 Wall. 543; 3 Gratt. 45; 3 H. & M. 144; 5 Ohio 461; 4 McLean 427; 4 Rand. 314; 4 Rand. 282; 6 Gratt. 444.

GREEN, PRESIDENT, delivered the opinion of the Court:

The first question presented by this record is: Did the *lis pendens,* duly recorded by the plaintiff White, bind the real estate of Joseph Perry? When the plaintiff instituted his action of debt against Perry, he had recorded a *lis pendens* stating, that the object of the suit was to obtain a judgment on certain specified bonds, and ultimately to obtain a lien on all the lands owned by Perry, describing them. The county court held, that the recording of this *lis pendens* created a lien on Perry's lands. The circuit court, I presume, held otherwise, as its decree was based on other grounds.

The appellee's counsel contends, that section 14 of chapter 139 of our Code was intended to enlarge the operation at common law of a *lis pendens,* extending it to

common law suits; and that it should therefore b liberally construed; and so construed, it would includ in its operations the case before us. This position i obviously erroneous. The purpose of this act wa to restrict, and not to enlarge, the operation of the com mon law rule of *lis pendens*. It is not true, that thi rule of *lis pendens* was unknown to the common law an was a rule applicable only to chancery causes. By th common law the *lis pendens* existed from the first momen of the day the writ issued and bore *teste*, and of necessity the courts of chancery adopted the general doctrine o *lis pendens* but relaxed in some degree the severity of the common law rule and held, that no *lis pendens* existed till the *service* of the *subpœna* and *bill filed*. See Judge Green's opinion in *Newman* v. *Chapman*, 2 Rand. 102, 103.

This rule is founded on the necessity of giving effect to the proceedings of the courts, as without it the administration of justice might always be defeated by successive alienations of the property in litigation; and it is obviously just as much a necessity in a common law, as in a chancery, suit. In defining this rule Judge Tucker in his Commentaries, vol. 2, p. 448 gives as an illustration of its application an action of *detinue* brought for the recovery of specific property, and stated that under the rule a purchaser *pendente lite* would be bound by the judgment in such a suit.

The doctrine of *lis pendens*, however necessary, is harsh in its effect upon *bona fide* purchasers, and has always been confined in its operation to the extent of the policy, on which it was founded; that is to give full effect to the judgment or decree, which might be rendered in the *suit depending at the time of the purchase*, (*the lis pendens*); and it applied only to proceedings directly relating to the thing or property in question. See *French* v. *Loyal Co.*, 5 Leigh 681; *Newman* v. *Chapman*, 2 Rand. 102; *Feigley* v. *Feigley*, 7 Md. 537; *Edmunds* v. *Crenshaw*, 1 McCord Ch. 252; *Jones* v. *Lusk*,

Metc. (Ky.) 356; *Lewis* v. *Mew*, 1 Strob. Eq. 180; *Clarkson* v. *Morgan*, 6 B. Mon. 441.

This suit pending, at the time that the deed was made by Perry to the appellant in the case before us, was an action of debt to recover a personal judgment against Perry. The object of this suit was not to subject Perry's lands to sale. The suit for that purpose was not instituted, till after the deed had been made by Perry to Tolly and duly recorded. The rule of *lis pendens* has therefore no application in this case.

The appellant's counsel insist, that the original bill in his cause was brought solely to enforce this supposed lien created by his *lis pendens*; and that what was called the amended bill was really filed for an entirely different object, to-wit: to set aside a deed as fraudulent in fact. If his position had been well founded, the original bill ought to have been dismissed, and the amended bill ought not to have been permitted to be filed by the court. But the record shows, that there is really no foundation for this position of the appellant's counsel. The original bill was not filed simply to set up the supposed lien created by the recording of a *lis pendens*. On the contrary its object was to subject all the real estate of Perry to the satisfaction of a judgment lien; and accordingly other lienors were made parties defendant.

It is true, the bill asked, that if the other real estate of Perry still owned by him should prove insufficient to satisfy the debts of Perry, which were liens on it, that the lands, which had been sold, or pretended to have been sold, by him to Tolly, might in such a contingency be sold, because, it was claimed a lien on them had been created by the recording of the *lis pendens*. But the sale of his land sold to Tolly, because bound by this *lis pendens*, was not the primary object of the bill. And when during the pending of the proceedings it affirmed, that the other lands of Perry named in the bill were insufficient in value to satisfy the plaintiff's judgment, the court properly permitted him to amend his bill and seek to charge the lands

1878
Special Term.

White
v.
Perry,

Syllabus 2.

which Perry had conveyed to Tolly, but which the amended bill alleged really belonged to Perry, so far as creditors were concerned, as the deed was fraudulent and void as to them. This was only pursuing further the main object of the original bill, to enforce against Perry's lands the lien of the plaintiff's judgment.

The only question remaining to be considered is Was the deed, made by Perry and wife to Tolly, in fact made to delay, hinder and defraud the creditors of Perry?

Before examining this point we must determine, whether the testimony of Mrs. Perry can be considered. It was excepted to, because she was the widow of Joseph Perry the grantor in the deed assailed. It is true a wife cannot be examined for, or against, her husband, except in an action, or suit, between them. See Code of West Va., chapter 130, §23, page 620. This general rule laid down in the Code is but the rule of the common law. It is analagous to that which excludes confidential communications between other parties bearing certain relations to each other. And Greenleaf in his work on evidence, 12th edition, Vol. 1, part III, ch. II, § 338, p. 391, says, "accordingly the wife, after the death of the husband, has been held competent to prove facts, coming to her *knowledge* from other sources, and not by reason of her situation as a wife, notwithstanding they related to the transactions of her husband." And for this position the following authorities are cited: *Coffin* v. *Jones*, 13 Pick. 445; *Williams* v. *Baldwin*, 7 Vt. 506; *Cornell* v. *Vanartsdalen*, 4 Barr 364; *Wells* v. *Tucker*, 3 Binn. 366.

In the case in 13 Pick. the court appears to approve the position of Greenleaf, though the point is not decided. It was also approved in the case in 7 Vt., where the widow was permitted to prove the contents of a letter addressed to her husband, and which she had seen. In the case in 4 Barr the widow was called upon to testify *for* the estate of her husband in a case, in which she had no interest, which would exclude her testimony, relating to

matters, which must necessarily come to her knowledge from other sources than confidential communications from her husband, though a portion of her testimony disclosed what her husband in her presence had said to the opposite party. Her evidence was held admissible and the court in stating the rule uses language very similar to that of Greenleaf. In the case in 3 Binney the court permitted a widow to prove the delivery to her of a bond by her husband, as a *donatio causa mortis*, for the use of a third person. That she was a competent witness seems to have been affirmed by the court, who made no comment on her competency.

In *Saunders* v. *Hendrix*, 5 Ala. 226, a widow of a co-maker of a promissory note was held to be a competent witness in a suit by a payee against the other joint maker to prove, that a credit endorsed was one hundred and not one thousand dollars, her testimony being against the interest of her husband's estate.

In the case of *McGuire* v. *Malony* 1 B. Mon. 224, the court went still further and held, that a widow, in a suit brought by her son against her husband's administrator, was competent to prove the execution of an agreement by her husband, and also his signing the name of the son and that of the subscribing witness, who were dead, and whose marks were made for their signatures; and that she heard her husband and son make and acknowledge the agreement; and that her husband then handed the instrument to her and she had since kept it. The court says, " that, so far as appears, the witness had no interest herself in the matter, about which she was called to testify ; and that her testimony could not affect the interest, person or *the character of her deceased husband.*"

It is nevertheless true, that the policy of the law, subserving the fundamental interests of society, so far protects that privacy and confidence, which are essential to the marriage relation, and necessarily spring from it, as not only not to allow, but to prevent, even after the termination of the coverture, any disclosure by the wife,

which implies a violation of the confidence, which was reposed in her as a wife.

The argument of counsel for appellant would go much further, and seal the lips of the wife from disclosing any act, or declaration, of the husband, done or said in her presence, and especially in his own house. But neither the principles laid down by the elementary treatises referred to, nor any adjudged case, which has been seen, nor the reason and purpose of the law, require, or indeed authorize, such an extension of the rule.

The law will not permit, even after the death of the husband, any disclosure by the wife, which seems to violate the confidence reposed in her as a wife, lest such permission might tend to impair the harmony of the marriage state, and affect injuriously the interests of society dependent on it. But where there is not even a seeming confidence, when the act done or declaration made by the husband, so far from being private or confidential, is designedly public at the time, and from its nature must have been intended to be afterwards public, there is no interest of the marriage relation, or of society, which in the absence of all interest of the husband, or wife, requires the latter to be precluded from testifying between other parties such act, or declaration, not affecting the character, or person, of her husband."

Upon these authorities I am prepared to say, that the wife after the death of her husband is competent to prove facts coming to her knowledge from other sources and not by reason of her situation as wife, notwithstanding they relate to the transactions of her husband. But I am not prepared to say, that she is permitted to disclose every communication to her, or in her presence, made by her husband, which does not seem to violate the confidence reposed in her as a wife. I am not prepared to lay down such a proposition, because of the very great difficulty in determining in particular cases, whether such communications seem to violate the confidence reposed in her as a wife. But be this as it may, I can

safely in the case before us say, that Mrs. Perry ought not to have been permitted to testify to the most material fact deposed to by her, that is, that her husband in the presence of Tolly told her, he had been paid by Mrs. Tolly for the land; for this declaration evidently affected the character of her late husband. The charge of the plaintiff is, that her husband fraudulently pretended, that he had received from Tolly the $1,000.00 which was the pretended consideration for his making the deed. The wife even after his death could not testify, that her husband told her, that this allegation in the deed, that the consideration was paid, was either true, or false; for such testimony reflects directly on his character as an honest man.

The declaration of Mrs. Perry made to third persons should of course be excluded; and while the declarations of Perry made to third persons may be used to prove his fraudulent purpose in making the deed, such declarations could not be used to prove the *knowledge* on the part of Tolly of such fraudulent purpose on Perry's part; and such knowledge must be proved, before the deed can be properly declared void as to creditors. The opinion of numerous witnesses, that from all they knew, they did not believe, that Tolly paid any money for this land, should of course be rejected.

When the case is stript of the large amount of irrelevant matter in the record, the pertinent testimony is not voluminous. The testimony of Joseph Perry was not taken. Tolly's statement is, that Joseph Perry sent for him, proposed to sell him this land for $1,000.00 cash, which proposition he accepted in good faith; that on the 18th day of October, 1875, he went to Perry's house for the purpose of getting from Perry his deed for this land, and took a notary public along with him to write the deed. When he left home for that purpose, he had the $1,000.00 in cash in his house to pay for this land; but he forgot to take it along with him. After the deed was executed, he says, he told Perry, he would pay him

in a day or two; and the notary suggested, he should give his bond for this $1,000.00, which he did. He thinks he said, that if he did not have enough money, he could get it from Mr. Stewart, or had a little in bank. Three or four days afterwards he paid this $1,000,00 bond off. He paid it in cash to Joseph Perry, who was in his bed. Nobody was present but his wife. He states, that when his deposition was taken, he had the bond; and he produces it uncancelled.

If these statements are true, the deed made by Perry and wife to Tolly was made for a valuable consideration and *bona fide*. But are these statements true? He told the witness, Bucher, that " Perry was in a needy condition and proposed to let him have the land, and take the pay part in a little money and provisions for family use along at times." This is inconsistent with his pretence now, that the proposition made and accepted was, that the whole consideration was to be paid in cash.

The notary, who drew the deed, testifies that the consideration expressed in the deed was $1,000.00. After the deed had been executed and acknowledged and handed over to Tolly, as no money had been paid, the notary-suggested the propriety of Tolly's executing his bond to Perry for the $1,000.00. Tolly said, he had not the money with him; but that the required amount was then in the hands of W. Stewart and in the bank of Lewisburg, and he would pay it to Perry in a few days. He executed his bond to Perry for the $1,000.00 payable on demand; and Perry handed it over to his wife.

The statement of Tolly, that he had this $1,000.00 in cash in his house at that time, and a few days afterwards paid it in cash to Perry is utterly inconsistent with this statement of the notary, and is highly improbable. Tolly went to Perry's house with the notary that morning to get his deed; and it is very improbable, that he would have forgotten to take with him the money, which was to pay for the land, as the purchase was to be altogether for cash, as he says. And if he

had forgotten to take the money with him, he would, it seems to me, have then so said to Perry; but instead of so saying he and Perry acted precisely, as if there had been no understanding, that any money was to be paid for the land at that time, and as though their further understanding had been, that no bonds or obligations were to be executed for the consideration. It was not till after the whole business had been closed and the deed delivered, that anything was said about the payment for the land; and the statement of the notary strongly implies, that but for his suggestion, that a bond should be given, neither Perry nor Tolly would have said a word about this $1,000.00, which Tolly says was to be paid in cash.

Perry was in very needy circumstances, and both the conduct of Tolly and Perry are inconsistent with any understanding, that $1,000.00 was to be paid Perry, when he executed this deed. Being called upon by the notary Tolly executed his bond for this $1,000.00 payable on demand, and said he would pay it in a few days out of moneys then in the hands of Stewart and in the bank at Lewisburg. But it is proven he had no money then in Stewart's hands. He had then in the bank of Lewisburg $500.00; but not one cent of it was paid to Perry, it being checked out to different parties, and only $150.00 drawn in cash by Tolly, and that not for more than a month after this transaction.

Tolly says, that a few days after this deed was made, he paid Perry $1,000.00 in cash no one being present except his wife. The law will not permit her statement to be read. If it could be read, it would not help to establish the truth of this statement of Tolly's. When this $1,000.00 was said to have been paid to Perry, he was in a very needy condition; he remained afterwards to his death in the same needy condition, having but $75.00 worth of personal property at his death. And after the time when Perry is alleged to have received this money, we find his family living on corn bread and

coffee; and Tolly is giving him two bushels of meal to live upon and $1.00 to buy medicine. Can we believe, that Perry had in his house then nearly $1,000.00 in cash, and that Tolly knew it? Yet if Tolly paid him this $1,000.00, he must have then had a large portion of it on hand in cash; for we do not find, that he paid any debts out of it, and he had a pension, out of which he probably paid his current expenses; on the contrary we find, that very small debts, and debts of a high obligation, went entirely unpaid.

The evidence forces on my mind the conviction, that the statement of Tolly, that he paid Perry this $1,000.00 in cash, is untrue.

There is some evidence, which makes it highly probable, that Tolly did give a small amount of money to Mrs. Perry; and that this small amount was paid over to her, and not to her husband, and was paid to her for the purpose of defrauding his creditors. When a constable was about to serve warrants on Perry for two small sums, Mrs. Perry said in Tolly's presence, that she would claim the benefit of the exemption law, as they did not have $200.00 worth of personal property; and Tolly remarked, if she had the money, he paid her, in her pocket, that that was nobody's business. And she did take the oath required by law accordingly; and when cautioned to give in all money on hand, she swore, that her husband had but fifty cents and no bonds, and that perhaps she had this fifty cents about her, and produced it. After her husband's death she had a $100.00 note; and she deposes, that it was a portion of the money paid by Tolly, which is highly probable, as from the evidence it is difficult to conceive, where else she obtained it. But, as the evidence shows, that she was in much want after her husband's death, it is very probable, that this $100.00 was given her by Tolly after her husband's death.

It may be said, that the production by Tolly of the $1,000.00 bond, he gave Perry, is evidence of its pay-

ment. Certainly it would be strong evidence ordinarily; but under the circumstances developed in this case it amounts to but little. Tolly in his answer says, the whole of the purchase money was paid by him in cash, and the bond taken up, cancelled and destroyed. And yet after Perry's death he produces this bond uncancelled; and in producing it simply says, he has it, without saying where or how he got possession. of it. This bond, when it was executed, passed immediately into the hands of Mrs Perry, where, it is not improbable, it may have remained till after her husband's death, and may have been delivered to Tolly, when he paid Mrs. Perry the $100.00, which we have seen was probably after her husband's death.

These deductions may be perhaps regarded as uncharitable; but the conduct both of Tolly and Mrs. Perry has been such as justly to give rise to suspicions. A portion of her evidence, on the principle we have laid down, should be regarded as competent testimony; but if it were all considered, it would not relieve either her, or Tolly, from the imputation of fraud, which the the other testimony throws on them.

She says, she gave this bond to Tolly by the direction of her husband, when he told her that Tolly had paid it off. But there are so many inconsistencies in her statement and conduct; that she must but regarded as a witness, who is unworthy of belief on oath. After being warned by the justice she deliberately swore, that she and her husband had but fifty cents in money, which she produced; and yet in the face of this she deliberately deposes in this case, that she then had in her possession a considerable sum of money, more than $100.00, which Tolly had paid her husband; and the testimony of the constable shows, that to this false swearing before the justice she was encouraged by Tolly. If it had been true, that Tolly had paid her husband $1,000.00 which he gave her, she certainly could have told with tolerable accuracy, what became of it; but she is

unable to name a single person, to whom any portion of it was paid. She says, it was spent in paying for necessaries. But this statement is obviously untrue; as no such sum could have been so expended, when the poor manner, in which Perry's family lived, is considered, and when it is remembered, he also had a pension, which also went to pay for necessaries.

Tolly in his deposition says, that he believed, that ·Perry had, when this deed was made to him, enough land left to pay all his debts. But this the record shows is not true. He was a near neighbor and knew, that Perry was much embarrased; knew the exact amount of the plaintiff's claim, and that suit had been brought for it. Perry's other lands did not sell for enough to pay the plaintiff's debt by about $900.00; and his other debts exceeded $800.00. Nor is there any reason to believe, that Perry's other lands were sacrificed, as Tolly alleges. They were sold by a commissioner in a suit, in which Tolly was a party. He was abundantly able to prevent their sacrifice, and was interested in so doing; yet neither he, nor any one else, objected to this sale; and it was confirmed. We must assume, that these lands did not sell at a grossly inadequate price.

It is true, that the law does not presume fraud; nor is it to be assumed on doubtful evidence, or circumstances of mere suspicion; but it must be distinctly proven. *Hord's adm'r* v. *Colbert et al.*, 28 Gratt. 49; *Herring et al.* v. *Wickham et al.*, 29 Gratt. 628. It need not however be proven by direct and positive proof; but like any other fact may be proven by circumstantial evidence; and from the very nature of the case it can rarely ever be proven in any other manner. And if the facts and circumstances surrounding the case, and distinctly proven, are such as to lead a reasonable man to the conclusion, that fraud in fact existed, this is all the proof thereof, which the law requires. *Lockhard & Ireland* v. *Beckley et al.*, 10 W. Va. 87.

In order to justify the setting aside of a conveyance,

as fraudulent in part as to creditors, the fraud on the part of the grantor must not only be proven, but the grantee must be proven to be a party to such fraud, or cognizant of it; but when this is once satisfactorily established by evidence, whether direct or circumstantial, the deed must be declared void *in toto*, as to creditors, though some consideration may have been paid by the grantee. He must be not only a purchaser for valuable consideration, but he must be a *bona fide* purchaser, or his deed is invalid as to creditors of the grantor. See *Garland* v. *Rives*, 4 Rand. 282; and Stanard, Judge, in *Hunters* v. *Waite*, 3 Gratt. 68.

The evidence in this case satisfies me, that the deed of October 18, 1875, executed by Perry and wife to Tolly was executed by the grantor, for the purpose of delaying, hindering and defrauding the creditors of the grantor, Perry, and especially the appellee White; and that the grantee in this deed, Tolly, was a party to this fraud fully concurring therein; and that this deed should therefore be declared null and void *in toto*, as to all the creditors of Perry; and that it should be so declared even though some consideration was paid by Tolly to Mrs. Perry for this land. He was not a *bona fide* purchaser; and the deed to him is therefore a nullity, as against all creditors of the grantor.

The decree of the circuit court of November 16, 1877, must therefore be affirmed; and the appellees must recover of the appellant their costs in this suit expended, and $30.00 damages; and this cause must be remanded to the circuit court of Greenbrier county, to be further proceeded with.

THE OTHER JUDGES CONCURRED.

DECREE AFFIRMED.