JENNIE MAHLSTEDT, Exrx., Defendant in Error, *vs.* THE
IDEAL LIGHTING COMPANY, Plaintiff in Error.

*Opinion filed December 22, 1915.*

1. NEGLIGENCE—*when liability of defendant as a mere manu-
facturer need not be considered.* In an action for damages against
the manufacturer of a gasoline lighting plant, the explosion of
which caused the injuries resulting in the death of the plaintiff's
husband, the question of the defendant's liability as a mere manu-
facturer need not be considered, where the evidence is such as to
authorize the jury in finding that it was the defendant, and not its
retail dealer, that sold the lighting plant to the deceased and un-
dertook to install it.

2. SAME—*what question goes merely to the credibility and not
the competency of a witness.* In an action for damages against
the manufacturer of a gasoline lighting plant, the fact that a suit
is pending against the local dealer handling the article for dam-
ages growing out of the same accident goes merely to the question
of the credibility of his testimony tending to show that it was the
defendant who sold and undertook to install the plant and not to
the competency of such testimony.

3. SAME—*question of contributory negligence is ordinarily one
of fact for the jury.* Whether the deceased was guilty of contribu-
tory negligence in leaving the carburetor of a newly installed gaso-
line lighting plant exposed to the sun's rays instead of covering it
with earth, and in lighting a match when he went into his cellar to
see if he could discover why the plant was not working, are ques-
tions of fact for the jury, where the evidence is such that reason-
able men, acting within the limits of the law, might reach different
conclusions.

4. SAME—*weight of evidence not considered in passing on rul-
ing on motion to direct verdict.* In passing on the ruling of the
trial court on a motion to direct a verdict in a suit at law the Su-
preme Court must look to the evidence supporting the claim of the
party against whom the motion is directed in the light most favor-
able to him, without considering contradictory evidence or weigh-
ing the evidence.

5. EVIDENCE—*when wife of defendant's deceased agent is in-
competent to testify.* The wife of the defendant's deceased agent
who supervised the installation of a gasoline lighting plant sold by
the defendant to the person whose death resulted from its explosion
is not competent to testify to a conversation between her husband

and the person for whom the plant was installed, with reference to the precautions to be taken by the latter when using the plant.

6. SAME—*plaintiff may be allowed to testify that the deceased supported her well.* In an action to recover damages for the alleged negligent killing of her husband it is not error to permit the widow to testify that her husband supported her well and purchased her clothing and supplies.

7. SAME—*it may not be prejudicial to defendant to allow testimony as to what property deceased left.* Although it is not competent to show what the pecuniary circumstances of the widow are or have been since the death of her husband, yet it is not necessarily prejudicial error, in an action for damages, to allow the widow to testify that the deceased at his death had certain live stock and forty acres of land, worth $150 per acre.

8. SAME—*general rule as to incompetency of wife to testify.* Under section 5 of the Evidence act, as well as at common law, irrespective of the question of interest, the rule is that the wife is incompetent to testify to communications or conversations with her husband or between him and third persons, whether the evidence is offered during or after coverture.

9. SAME—*what may be testified to by wife.* A plaintiff suing for damages for the killing of her husband by an explosion following his lighting of a match in the cellar of his house to see if he could ascertain why his newly installed gasoline lighting plant was not working properly, may testify that there had been no gasoline on the premises for two years until the plant was installed; that when she tried to light a burner just prior to the accident it made a blue flame but went out and would not light; that she was the only person in the cellar during the day until the accident, and that no gasoline had been in the cellar prior to the accident. (*Schreffler* v. *Chase,* 245 Ill. 395, explained.)

10. SAME—*question of qualification of experts is largely one for the trial court.* The question of the qualification of an expert rests largely in the discretion of the trial court, and the test of qualification is necessarily a relative one, depending upon the subject under investigation and the fitness of the particular witness.

11. SAME—*what is proper subject for expert testimony.* Where the subject under investigation is an explosion in the cellar of a house in which a gasoline lighting plant had been installed, having the tank and carburetor outside of the house, in the ground, witnesses having special knowledge and experience in such matters may give their opinions as to how gasoline could have gotten into the cellar.

12. SAME—*when circular issued by defendant is admissible.* A booklet or circular describing the lighting plant manufactured by the defendant, one of which plants was sold by the defendant to the plaintiff's husband, is admissible in evidence in an action for damages, where the circular was printed and issued by defendant and it is shown that plaintiff's husband was seen reading the circular, which represented that the lighting plant would be installed· by an expert and would be safe enough for·a child to operate.

COOKE, J., dissenting.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Rock Island county; the Hon. ROBERT W. OLMSTED, Judge, presiding.

SEARLE & MARSHALL, for plaintiff in error.

GEORGE W. WOOD, for defendant in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This action was brought by defendant in error in the circuit court of Rock Island county to recover from plaintiff in error damages for the death of her husband, which, it was alleged, was caused by the negligence of plaintiff in error. On a trial before a jury a verdict was returned in favor of defendant in error and judgment entered thereon. On appeal to the Appellate Court that judgment was affirmed. The cause has been brought here on petition for *certiorari.*

Daniel Mahlstedt, at the time of his death and for several years previous, resided with his wife on his farm about fifteen miles east of the city of Rock Island. He was injured on May 21, 1911, by an explosion of gas or vapor in his farmhouse, and afterwards died of blood poisoning caused by those injuries. Plaintiff in error is a corporation located in Davenport, Iowa, engaged in the manufacture and sale, among other things, of gasoline lighting and heating systems. Whiteside Bros., located in Joslin, Rock Island·

county, Illinois, a few miles from the Mahlstedt farm, were engaged in the general implement business, and while conducting that business had handled and installed a number of the plaintiff in error's lighting systems or machines. These systems appear to have been sold to a large extent in the country districts, being installed in homes where illuminating gas or electricity was not available. H. S. Busier was a traveling salesman for plaintiff in error. A short time before the accident to Mahlstedt, Busier called at the store of Whiteside Bros. and suggested that one of them go out with him to see if they could not work up some business, and George Whiteside accordingly drove around the adjoining country in his automobile with Busier, calling on Mahlstedt among others. The evidence is not very complete as to what took place during this visit, as Mahlstedt and Busier are both dead. As a result, however, of this trip Mahlstedt agreed to purchase one of the lighting systems, and drove from his farm to plaintiff in error's factory at Davenport, Iowa, May 18, 1911, and took the machine home with him in his wagon, and also took with him some gasoline from the Standard Oil Company. There is a controversy as to whether Whiteside Bros. or plaintiff in error was to install the machine. We think it is clear, however, that Whiteside Bros. were to furnish the necessary materials and do the work for the installation of the system and that plaintiff in error was to send an expert to look over the work and start the plant. The work was commenced by George Whiteside and a helper on Friday, May 19, and continued on Saturday. Busier came out Saturday morning from Davenport and remained all day on the farm, taking part in the installation of the system. The plant consisted of a carburetor, a blower, the apparatus that ran the blower, and various connecting pipes. The carburetor was placed in a hole dug in the ground outside of the building and was intended to be covered with earth. It contained two compartments, in one of which gasoline was placed. By means

of a heavy weight and fan the blower forced air through the gasoline in said carburetor, forming a gasoline vapor, which was then led to the house through a pipe and distributed through various pipes to the stove and gas-burners. By Saturday evening, May 20, the lighting system was sufficiently installed so that it could be started and used for house purposes, but the carburetor, placed in a hole in the yard, twenty or thirty feet from the house, had not yet been covered by dirt. The lighting system was operated that evening at Busier's suggestion, he himself starting it, and Mrs. Mahlstedt used it for getting supper for all the people there. There was something more to be done to finish the installation, including the covering of the carburetor with earth, and Busier and Whiteside left with the understanding that Whiteside should return Monday and complete the work. The next day, Sunday, May 21, was bright and hot. The Mahlstedts used the plant for lighting and cooking purposes during the day, but towards night Mrs. Mahlstedt was unable to light a burner. She so informed her husband, and he went into the basement to investigate, and, lighting a match to see what was the matter, was fatally injured by an explosion of gas, as was also a young girl who assisted Mrs. Mahlstedt with her work.

Counsel for plaintiff in error insist that the machine was sold to Mahlstedt by Whiteside Bros., who were to install it, and therefore plaintiff in error cannot be held liable for any defect in installation; that the evidence shows no defect in the machine that would make said company liable, in selling goods to a retailer, for an injury to one purchasing from said retailer. On May 18, when Mahlstedt obtained this lighting system from plaintiff in error at its factory, in accordance with an arrangement made the day Busier and George Whiteside called at Mahlstedt's farm, plaintiff in error sent Whiteside Bros. an invoice of the items it had delivered to Mahlstedt, stating, among other things, "Sold to Daniel Mahlstedt and charged to Whiteside

Bros.," and a letter accompanying said invoice, saying, "We trust you will lose no time in installing the outfit for our customer." There is some controversy as to what conversation took place at the factory at the time this lighting outfit was delivered to Mahlstedt, one of the company's employees stating that Mahlstedt said that Whiteside Bros. were to install it, while other witnesses testified that no such statement was made by Mahlstedt. Mahlstedt at that time may not have known with certainty whether he was buying from plaintiff in error or Whiteside Bros., because he asked whom he should pay, and was told by one of the company's officers that it made no difference,—that he could pay either, as he desired. The invoice sent to Whiteside Bros. was subject to a commission and discount. As between plaintiff in error and Whiteside Bros. it was treated as a sale by the latter, and the purpose of plaintiff in error in furnishing its agent, Busier, to solicit trade was doubtless to create a demand for its goods, which were to be handled in that locality by Whiteside Bros. in their business as retail merchants. Beyond question, however, the weight of the evidence shows that Busier sold the lighting system and tends to show that he was in charge when it was installed. We shall have occasion to refer to this later, however, in discussing the questions involved herein. Manifestly, on this record the jury were warranted in finding that as between Mahlstedt and plaintiff in error it was plaintiff in error, and not Whiteside Bros., that sold and undertook to install the system, and therefore that plaintiff in error could be held liable in that capacity and not merely as manufacturer. Instructions were given for plaintiff in error which correctly stated the law as to the right to recover from plaintiff in error if the jury believed that the sale was made by Whiteside Bros. and not by plaintiff in error. This being so, it is unnecessary to consider or discuss the numerous authorities cited by plaintiff in error that there can be no recovery against it as manufacturer of this lighting system.

Defendant in error insists that the air-pipe between the carburetor and the blower was not properly installed; that it was not erected of sufficient height so that the weight of the column of gasoline standing in it would overcome the vapor pressure before the column of gasoline would reach the top of the pipe, and that on this account the gasoline was forced through the pipe and blower into the cellar and thus made possible the explosion; that the carburetor was improperly placed and improperly left uncovered. Whatever may be the fact as to the placing of the pipes properly or improperly, without doubt the cause of the accident was the effect of the sun's heat on the gasoline in the carburetor on Sunday, May 21, and had the carburetor been covered before it was used the accident would not have happened. George Whiteside testified that when he left Saturday night he told Mahlstedt that the carburetor must be covered before using it, to prevent the heating of the gasoline, but that Busier, who was taking part in the conversation, said it didn't make much difference. Whiteside further stated that he could not say that he told Mahlstedt that there would be any danger in using the plant if the carburetor was not covered.

Counsel for plaintiff in error earnestly contend that Busier was not in charge of the installation of the plant. Whiteside testified that Busier took entire charge, and at least one other witness and employee of Mahlstedt testified to the same effect, and most of the evidence admitted by the court tends strongly to support the same conclusion. It is true that Whiteside testified that Busier said to him that he had never helped install a machine before and that Whiteside admitted that he had assisted in installing two or three, but it is also true that Busier had been the active agent in selling this machine, and the evidence, as we have stated, tends strongly to support the conclusion that he was in charge of installing it. After the accident Mahlstedt asked a neighbor to telephone Busier to come and see about the

explosion. It is not shown in the record that Mahlstedt knew that Busier was not an expert in installing machines or that he heard Busier state that he had never seen a machine installed before. There can be no question from the evidence that Busier himself started the plant Saturday night before he left and told Mrs. Mahlstedt that she could use it for cooking her supper.

Counsel for plaintiff in error argue in this connection that the testimony of George Whiteside should not be relied on as to whether plaintiff in error or Whiteside Bros. sold the lighting system to Mahlstedt. It appears from the record that there is a suit pending against Whiteside Bros. for the same injury, and it is contended that their interest in the event of this suit is such that they would want the liability to rest on plaintiff in error rather than upon themselves, and that that is a strong reason for disregarding his testimony; that Busier died before the trial, and that the agent who delivered the machine was disqualified because of his interest, and that all of this put plaintiff in error in a difficult position to prove facts. The jury seem to have been fully instructed by the court as to the weight to be given to interested witnesses. Whiteside was competent to testify, and his evidence cannot be disregarded merely because he might be interested or prejudiced. The weight of his testimony was for the jury, and we see no error as to any instructions on this point.

Counsel for plaintiff in error urgently insist that Mahlstedt, in not covering the carburetor, was guilty of such contributory negligence as to defeat recovery. It may be that the action of heat on gasoline is a matter of common knowledge, but the fact that the result of heating this gasoline in the carburetor located in the yard would be to force gasoline through the air-pipe into the cellar, or to cause gas to escape in the cellar, would not be known to a man not familiar with this lighting system. While the evidence in the record is not in entire harmony on this question, there

271 — 11

is no contradiction of Whiteside's statement that Busier said, in Mahlstedt's presence, that it would not make much difference whether the carburetor was covered before it was used on Sunday.

In this connection counsel for plaintiff in error also contend that Mahlstedt was guilty of contributory negligence in lighting a match in the cellar. The evidence of one of the neighbors is to the effect that after the accident Mahlstedt told him that he smelled gasoline before he went into the cellar. Counsel for defendant in error attempted to impeach this witness by producing other witnesses who testified to facts that tended strongly to show that the witness could not have talked to Mahlstedt at the time and on the occasion specified. There is evidence in the record, also, that tends to show that Mahlstedt did not know that there was any gas in the cellar before he lit the match. It appears from the evidence that when Busier came, between ten and eleven o'clock the night of the accident, having been telephoned at Mahlstedt's request, he started to go into the cellar to look over things and apparently prepared to strike a match, but was told by one of the neighbors not to do that, as Mahlstedt had said no one must light a match in the cellar. Busier then procured a lantern and held it outside a cellar window and looked through to see if the jet was closed. While Mahlstedt had a relative who had a plant of this kind installed on his place and Mahlstedt had seen that plant working, there is nothing tending to show that Mahlstedt knew anything about the principles upon which the lighting system worked or that he had any reason to suppose that gas or gasoline would escape through the pipes into the cellar. On the contrary, we think he was led to believe that the lighting system worked so safely and easily that it could be used by anyone without danger. The question of contributory negligence is usually one of fact for the jury. It only becomes one of law for this court when the undisputed evidence is so conclusive that it is

clearly seen that the accident resulted from the negligence of the party injured and could have been avoided by the use of reasonable precautions. (*Beidler* v. *Branshaw,* 220 Ill. 425; *Mueller* v. *Phelps,* 252 id. 630.)· Where reasonable men, acting within the limits prescribed by law, could reach different conclusions from the admitted or established facts, questions of contributory negligence are for the jury. (*Illinois Central Railroad Co.* v. *Anderson,* 184 Ill. 294; *Chicago City Railway Co.* v. *Nelson,* 215 id. 436; *Chicago and Joliet Electric Railway Co.* v. *Wanic,* 230 id. 530; *Heidenreich* v. *Bremner,* 260 id. 439.) On this record we do not think it can be held, as a matter of law, that Mahlstedt was guilty of contributory negligence in not covering the carburetor or in lighting a match in the cellar.

Counsel for the plaintiff in error insist that upon the question of its liability the court should have granted the motion directing a verdict in its favor on the ground that it was not liable either as a manufacturer or a retailer. With this contention we do not agree. In passing upon such a motion for a directed verdict this court only looks to the evidence supporting the claim of the party against whom the motion is directed, and that in the light most favorable to him. Contradictory evidence, however strong, cannot be considered. (*Balsewicz* v. *Chicago, Burlington and Quincy Railroad Co.* 240 Ill. 238.) All controverted questions of fact are settled by the verdict of the jury and the judgment of the Appellate Court. We have repeatedly decided that on a motion to take a case from the jury, either at the close of plaintiff's evidence or at the close of all the evidence, the naked question is thereby raised in this court whether or not there is any evidence in the record fairly tending to support the plaintiff's cause of action. It is never a question of the weight of the testimony. *Chicago City Railway Co.* v. *Martensen,* 198 Ill. 511; *Illinois Steel Co.* v. *Saylor,* 226 id. 283; *Sturges & Burn Manf. Co.* v. *Great Western Smelting and Refining Co.* 248 id. 285.

Counsel for plaintiff in error further insist that the court erred in allowing Mrs. Mahlstedt to testify as to the amount of her husband's property, contending that in suits of this kind evidence as to the domestic relations or financial standing or circumstances of the parties is improper, citing 1 Elliott on Evidence, sec. 178, *Jones & Adams Co.* v. *George,* 227 Ill. 64, and other authorities, in support of this contention. Mrs. Mahlstedt was asked by counsel for defendant in error, over objection and exception, what property her husband had at the time of his death. She was permitted to answer that he had certain live stock and forty acres of land worth $150 an acre. She was also permitted to answer that he provided for her in good shape and purchased her clothing and supplies. It is not competent to show what the pecuniary circumstances of the widow, family or next of kin are or have been since the death of the decedent, but it is competent to show that the wife, children or next of kin were dependent upon him for support before and at the time of his death. (*Pennsylvania Co.* v. *Keane,* 143 Ill. 172; *Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* v. *Kinnare,* 203 id. 388.) The property, wealth, helplessness or dependence of the relatives of the deceased is immaterial on the question of the recovery of damages. That feature is not to be considered in measuring or estimating the loss sustained or in determining the liability where the death is caused by the wrongful act of the defendant, (*Chicago, Peoria and St. Louis Railroad Co.* v. *Woolridge,* 174 Ill. 330,) but it is not error to allow questions concerning the earnings of the deceased and that they were used in support of his wife or children. (*Brennen* v. *Chicago and Carterville Coal Co.* 241 Ill. 610.) Under these authorities there was no error in allowing the widow to testify that her husband supported her and in what manner. We do not see the purpose of allowing her to testify as to the amount of property he left. The record shows that he left a will but does not show its provisions or

what his indebtedness was, if any. The record shows that the deceased left no children. It would be improper to show what property the wife received from the husband. There is nothing in this record, however, from which we can infer what property the wife was to receive. We cannot say, under the authorities heretofore cited, that the admission of this evidence as to the amount of property Mahlstedt left was prejudicial, on this record, to plaintiff in error.

On the trial of the case counsel for plaintiff in error called Mrs. Busier to the stand and showed by her that she accompanied her husband to the Mahlstedt farm on May 20, 1911, and remained with him there until after supper, in the evening. They offered to prove by her that Busier during that visit informed both Whiteside and Mahlstedt that he had come there out of curiosity, to see the installation of the machine and plant; that he had never yet seen one installed though he had sold a great number of them; that before leaving he told Mahlstedt not to use the plant until the carburetor, tank and pipes had been covered with earth. The trial court held this testimony incompetent under the proviso of section 5 of the statute on evidence, which reads: "*Provided,* that nothing in this section contained shall be construed to authorize or permit any such husband or wife to testify to any admissions or conversations of the other, whether made by him to her or by her to him, or by either to third persons, except in suits or causes between such husband and wife." (Hurd's Stat. 1913, p. 1235.) In *Goelz* v. *Goelz,* 157 Ill. 33, this court had occasion to review the history of this statute and its amendments, and held (p. 41): "On grounds of public policy, and wholly independent of any question of interest or identity, neither husband nor wife could at common law testify to communications or conversations occurring between them during coverture; and this inability to testify continued, as to such communications and conversations, even after the marital relation was severed, either by di-

vorce or by death.—1 Greenleaf on Evidence, secs. 254, 334, and following sections." The court then referred to the provisions of said section 5, and said that it was a recognition and re-enactment of the common law on the question just quoted, confining its operation, however, to suits or causes other than those between husband and wife. This same rule has been followed and approved by this court since that time. (*Joiner* v. *Duncan,* 174 Ill. 252; *Wickes* v. *Walden,* 228 id. 56; *Donnan* v. *Donnan,* 236 id. 341; *Abrahams* v. *Woolley,* 243 id. 365; *Schreffler* v. *Chase,* 245 id. 395.) Under these authorities, irrespective of the question of interest, the rule is that the wife is incompetent, under the common law as well as this statute, to testify to communications or conversations with her husband or between him and third persons, whether the evidence is offered during or after coverture. Necessarily, under this rule, Mrs. Busier was incompetent to testify as to any conversations her husband had in her presence with Whiteside or Mahlstedt or as to any statement that he made to them.

Counsel for plaintiff in error insist that the trial court erred, under the provisions of said section 5, in permitting Mrs. Mahlstedt to testify that no gasoline had been in the cellar of the farmhouse prior to the accident, nor any gasoline on the premises for a period of two years before this lot was brought there by her husband at the time he was installing the plant; that the court also erred in permitting her to identify the printed catalogue of plaintiff in error and to testify that it was left with Mahlstedt at the time Whiteside was there to see him, and also in admitting her testimony that she tried to light the burner on Sunday evening, just prior to the accident; that it made a blue flame and then went out but did not light; that she was the only one who had been in the cellar of the house that day before the accident to Mahlstedt. It will be seen that the testimony of Mrs. Mahlstedt that is objected to by plaintiff in error had no reference to any conversation of her husband

that she had overheard, but it is insisted that the knowledge of the facts about which she testified in the objected testimony came to her by virtue of the marital relation and therefore was incompetent. There is nothing in said section 5 that bears on this question. This court has more than once stated that at common law a husband or wife could not be a witness to testify to any fact or transaction, knowledge of which was obtained by means of the marriage relation. (*Schreffler* v. *Chase, supra,* and cases cited.) More than one of the Illinois decisions, in laying down this rule, have correctly cited section 337 of Greenleaf on Evidence in its support; but that author also in section 338 states that the wife may testify, after the death of the husband, to facts "coming to her knowledge from other sources and not by means of her situation as a wife, notwithstanding they related to the transactions of her husband." (1 Greenleaf on Evidence,—Lewis' ed.—sec. 338.) We shall refer to some of the authorities cited by this author in support of this rule.

In *Williams* v. *Baldwin,* 7 Vt. 503, the widow was held competent to prove the contents of a letter addressed to her husband and which she had seen. In *Wells* v. *Tucker,* 3 Binn. 366, the widow was permitted to testify as to the delivery to her of a bond by her husband for the use of a third person. In *Ryan* v. *Follansbee,* 47 N. H. 100, the surviving wife was permitted to testify to matters in which her deceased husband was interested and in which herself was an agent, on the ground that the knowledge of these facts came to her from sources other than her husband. In *Moore* v. *Wingate,* 53 Mo. 398, the widow was not permitted to testify as to facts which she could only have learned from her husband, the court holding that this sort of evidence was excluded on the ground of public policy and "to preserve the harmony of the marriage relation."

There are other authorities not cited by Greenleaf which bear on this question, to a few of which we will refer. In

*Dexter* v. *Booth,* 84 Mass. 559, it was held in an action against an executor to recover the price of goods sold and delivered to the wife during her husband's lifetime, that she could not testify, after his death, to a private conversation with him, but as to other facts from other sources she was a competent witness. In *Mercer* v. *State,* 40 Fla. 216, it was held that letters from husband to wife, or from her to him, were not admissible, and the court stated that the common law rule as to competency of witnesses, forbidding either husband or wife to testify in any case where either was interested, was grounded upon the principle that they should not be permitted to testify to those transactions or communications passing between them in the sacred confidence and trust that should exist between husband and wife. In *Saunders* v. *Hendrix,* 5 Ala. 224, a widow of the co-maker of a promissory note was held to be a competent witness in a suit by a payee against the other joint maker to prove that a credit indorsed on the note was $100 and not $1000. In *McGuire* v. *Maloney,* 1 B. Mon. 224, the court held that a widow, in a suit brought by her son against her husband's administrator, was competent to testify as to the execution of an agreement by her husband, and also as to his signing the name of the son and that of the subscribing witnesses, who were dead, and who signed by mark. In *White* v. *Perry,* 14 W. Va. 66, it was held that while the wife could not testify as to conversations of her husband, she was competent, after his death, to testify as to any facts coming to her knowledge from other sources than her husband, notwithstanding they related to his transactions. *Hale* v. *Kearly,* 67 Tenn. 49, was an action brought by an administrator for damages against the defendant for causing the death of the intestate. The widow was held competent to testify as to what she saw occurring between her husband and the defendant at the time the latter inflicted the fatal injuries upon her husband. The court said in discussing this question (p. 52) : "It is readily conceded

that on the grounds of public policy neither husband nor wife should be allowed to testify as to the conduct or conversation of either, made known in the frankness and freedom of a confidential intercourse, but can the rule apply, as in the present case, where the wife happens to witness a rencounter between her husband and a third party which results in the death of her husband? What reason of public policy forbids the wife to detail what she saw, in a suit for damages for the killing?" In the American and English Encyclopedia of Law (vol. 30, 2d ed. p. 950,) it is stated that the great weight of authority is to the effect that after the death of one of the parties to the marriage the other may testify in favor of the estate as to all facts not learned through the confidence of the marital relation, citing many authorities in support of this statement, including some of those to which we have referred.

Counsel for plaintiff in error rely especially in support of their contention upon the reasoning of this court in *Schreffler* v. *Chase, supra,* and cases cited in that decision. In that case we quoted with approval from *Griffeth* v. *Griffeth,* 162 Ill. 368, where the court said, among other things (p. 373) : "Whether the divorced wife's knowledge of her husband's conduct in the respect here referred to came to her as the result of his admissions to her or of her conversations with him, or as the result merely of her own ob-. servation, it was acquired in the confidence of the marriage relation, and therefore her evidence in regard to it should have been excluded upon principles of public policy. The protecting seal of the law is placed upon all confidential communications between the husband and the wife, except so far as our statute has changed the rule. It makes no difference that the marriage relation no longer exists between them. 'Whatever has come to the knowledge of either by means of the hallowed confidence which that relation inspires cannot be afterwards divulged in testimony,

even though the other party be no longer living.'—1 Green-leaf on Evidence, sec. 337."

It seems clear from this quotation and from the evidence objected to in that case, that the main point of that decision, as of other decisions in this State, was based on the rule laid down by Greenleaf, just quoted, that the facts or conversation came to the knowledge of the witness because of the confidential relation of husband and wife. Examination of the authorities cited in that case, we think, will disclose that the knowledge as to the facts in each of the cases came to the witness from the husband or from his actions because of the confidence of the marital relations. In commenting on the *Schreffler case* in 137 Am. Rep. 330, where that case is given in full, the author states in the foot-note that the matter concerning which the law prohibits either the husband or the wife from testifying includes any information obtained during the marriage or by reason of its existence; that this rule "should not be confined to mere statements by one to the other, but embraces all knowledge upon the part of either, obtained by reason of the marriage relation, which but for the confidence growing out of it would not have been known." Manifestly, by the common law rule, as shown by the authorities from other jurisdictions as well as in this State, Mrs. Mahlstedt was competent to testify as to any facts the knowledge of which she had obtained from sources other than her husband. She certainly obtained her knowledge as to there being no gasoline in the cellar of the farmhouse and as to the catalogue, and other objected testimony, from sources independent of her husband and not because of any confidential relation between them. The court did not err in its rulings as to her testimony on this question.

Counsel for plaintiff in error argue that the trial court committed error in permitting certain persons to testify as experts who were not qualified. The question of the qualification of an expert rests largely in the discretion of the

trial court.   There can be no arbitrary or fixed test but necessarily only a relative one, depending somewhat on the subject and the particular witness.   (*Bonato* v. *Peabody Coal Co.* 248 Ill. 422.)   From the evidence in the record we think the expert witnesses were qualified to testify as to the subjects about which they were interrogated.

It is also urged that the court erred in permitting experts to testify how the gasoline which caused the explosion might have gotten into the cellar, as it was contended that was the ultimate question the jury were called upon to decide.   With this we do not agree.   It is an elementary rule that where the court or jury can make their own deductions they shall not be made by those who testify.   (*Evans* v. *People,* 12 Mich. 27.)   Expert evidence is admissible when the witnesses offered as experts have peculiar knowledge or experience not common to the world, which renders their opinions founded on such knowledge or experience an aid to the court or jury in determining the question at issue.   Expert testimony is proper when the subject matter of the inquiry is of such a character that only persons of skill or experience in it are capable of forming a correct judgment as to any fact connected therewith.   (*Yarber* v. *Chicago and Alton Railway Co.* 235 Ill. 589; *Taylor* v. *Town of Monroe,* 43 Conn. 36;   1 Greenleaf on Evidence,—Lewis' ed.— sec. 280; *People* v. *Jennings,* 252 Ill. 534.)   Manifestly, it required peculiar skill and judgment by those who had experience in such matters to state how the gasoline might get into the cellar.   We think the witnesses on this question were properly allowed to give their judgment as to how the gasoline got there.

Counsel for plaintiff in error further contend that the court erred in admitting in evidence a booklet or circular issued by plaintiff in error with reference to heating and lighting plants or systems similar to the one attempted to be installed in the Mahlstedt house.   It is not denied that said company printed and issued such circular or booklet.

If, as we have held, the jury were justified in finding that plaintiff in error sold the lighting system to Mahlstedt, then we cannot see why this booklet was not properly admitted. The testimony shows that Mahlstedt was seen reading it; that it contained representations as to the machine's safety that may have misled him as to the safety or danger of the system, and especially as to the necessity of covering the carburetor before the machine was used. The declaration alleged that plaintiff in error represented that the system had been constructed and would be installed under the supervision of an expert and would be safe enough for a child to operate, but that, in fact, the system was dangerous, and that by reason of the fact the machine was not safely equipped the accident occurred. The statement in this booklet would tend to lead Mahlstedt to think that precautionary measures were unnecessary in the operation of the system. (1 Thompson on Negligence, secs. 827, 828; 29 Cyc. 479.)

Plaintiff in error further insists that the court erred in refusing one of its instructions, and, as we understand the argument, in modifying certain other instructions. If we are right in the conclusions already stated in this opinion it is clear that the court did not err in its rulings as to these instructions.

There are certain other questions raised in the briefs of counsel for plaintiff in error, but we do not think the trial court committed any error on those questions or that they are of sufficient importance to further extend this opinion.

We find no reversible error in the record, and the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE COOKE, dissenting.